**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **upon the relation and for the use of the** | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18-cv-01145** |
| | ) | **Judge Aleta A. Trauger** |
| **ADDITIONAL RIGHTS WITH** | ) | |
| **RESPECT TO A PREEXISTING** | ) | |
| **EASEMENT AND RIGHT-OF-WAY** | ) | |
| **OVER LAND IN MONTGOMERY** | ) | |
| **COUNTY, TENNESSEE, and** | ) | |
| **LORRAINE M. NEARY,** | ) | |
| **LORRAINE E. NEARY,** | ) | |
| **ALTRA FEDERAL CREDIT UNION,** | ) | |
| **JIM EDWARDS, Trustee,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM and ORDER**</u>

Before the court is the Motion to Exclude Opinion Testimony of Defendants' Retained Expert Russell E. Parrish (Doc. No. 35), filed by the plaintiff, the United States of America upon the relation and for the use of the Tennessee Valley Authority ("TVA"). For the reasons stated below, the motion will be granted.

**I.     BACKGROUND**

TVA initiated this action on October 19, 2018, for the purposes of asserting additional rights over an already existing easement and determining just compensation for the property to be taken, in accordance with Rule 71.1(h) of the Federal Rules of Civil Procedure. (Complaint, Doc. No. 1.)

TVA acquired a 100-foot-wide permanent easement and right-of-way over farmland in Montgomery County in 1941 (the "1941 Easement"), that bestowed upon TVA the "perpetual right to enter and to erect, maintain, repair, rebuild, operate, and patrol one electric power transmission line, including the right to erect such poles and other transmission line structures, wires, cables, and any necessary appurtances." (1941 Easement, Doc. No. 36-1.) According to TVA, it subsequently built a 69-kV high voltage transmission line within the right-of-way established by the 1941 Easement. In 1966, the farmland encumbered by the easement was subdivided into residential lots. (Doc. No. 36, at 2–3.) One of the lots (the "Subject Property"), identified by the Assessor of Property for Montgomery County, Tennessee as Montgomery County Tax Map 065I, Parcel A 010.00, is the subject of this condemnation action. (Am. Stips., Doc. No. 24 ¶ 2.) The Subject Property contains 3.03 acres, of which a 0.36-acre portion is encumbered by the 1941 Easement. (*Id.* ¶ 1, 3.) The 0.36-acre easement area on the Subject Property is identified in TVA land records as SPC-92F (hereinafter, the "SPC-92F right-of-way"). (*Id.* ¶ 3.)

A single-family home was built on the Subject Property in 1987. (Doc. No. 36, at 3.) An aerial view of the Subject Property shows that the area has become a residential neighborhood, with other houses on similarly large lots adjacent to and across from the Subject Property. (*See* Doc. No. 34-6, at 6.) The Stipulated Survey of the Subject Property shows that the southwest corner of the house is within ten feet of TVA's right-of-way and less than seventy-five feet from an existing transmission structure built within the right-of-way. (Doc. No. 29-2.) Lorraine M. Neary and Lorraine E. Neary (the "defendants" or "the Nearys") purchased the Subject Property, subject to the SPC-92F right-of-way, in 2013. (Doc. No. 34-6, at 12 (citing Deed Volume 1523, Page 508, Register's Office for Montgomery County, Tennessee, July 22, 2013).)

According to TVA's theory of the case set forth in the Initial Case Management Order, TVA announced a plan to make improvements to its existing transmission system in Montgomery County, Tennessee, by upgrading seven miles of the existing 100-foot right-of-way and the existing 69-kV transmission line built within that right-of-way by: (1) retiring and replacing outdated existing transmission line structures; (2) retiring the existing 69-kV transmission line and replacing it with a new, upgraded 69-kV line; (3) building a new 161-kV transmission line; and (4) building new communications circuits. (*See* Doc. No. 21, at 2.) The SPC-92F right-of-way over the Subject Property is within the area subject to these upgrades.[1]

TVA filed this action on October 19, 2018 (the "date of taking") to acquire additional property rights within the existing right-of-way (the "2018 Taking"). It describes the additional rights taken as follows:

> A permanent easement and right-of-way, consisting of the perpetual right to enter at any time and from time to time the present right-of-way and to erect, maintain, repair, rebuild, operate, and patrol lines of transmission line structures with wires and cables for electric power circuits and communication circuits, and all necessary appurtenances, including guy wires, in, on, over, and across said right-of-way, together with the perpetual right to clear said right-of-way and keep the same clear of structures (including but not limited to flagpoles, solar panels, buildings, signboards, billboards), trees, brush, stored personal property, and fire hazards, to destroy or otherwise dispose of such trees and brush; to prevent the drilling or sinking of wells within the right-of-way; and to remove, destroy, or otherwise dispose of any trees located beyond the limits of said right-of-way which in falling could come within five feet of any transmission line structure or conductor located thereon, the Tennessee Valley Authority to remain liable for any direct physical damage to the land and annual growing crops resulting

---

[1] The parties' stipulated map shows the configuration of the Subject Property, the 1941 Easement, the SPC-92F right-of-way, and other orienting boundaries and landmarks. (2d Stip. & Ex. 1, Doc. Nos. 29 ¶ 1 & 29-1.) On the stipulated map, TVA's pre-existing 100-foot right-of-way is shaded blue with the centerline of the right-of-way depicted as a grey line. (Doc. No. 29-1.) The 0.36 acre preexisting SPC-92F right-of-way that crosses the Subject Property is shaded magenta. The approximate location of the old transmission structure is depicted as a blue dot on the southern border of the Subject Property, and the approximate location of the new structure built to replace the old structure is depicted as a green dot. (*Id.*) The map also shows the location of the Nearys' home relative to the right-of-way and the transmission structures.

directly from the operations of the construction and maintenance forces of its agents and employees in the erection and maintenance of or in exercising a right of ingress and egress to said transmission line structures, all upon, under, over, and across the described land[.]

. . . .

The foregoing easement rights are acquired except insofar as those rights or any part thereof are already owned by Plaintiff, which heretofore acquired and now owns a preexisting permanent easement and right-of-way for electric power transmission purposes over said land totaling 0.36 acre, more or less, by virtue of a grant of transmission line easement (Tract SPC-92) recorded in Deed Book 87, page 255, in the office of the Register of Montgomery County, Tennessee.

(Decl. of Taking and Attach. 1, Doc. Nos. 2, 2-1.)

Prior to the 2018 Taking, one part of the outdated transmission line structure being replaced ("old structure") was situated within the SPC-92F right-of-way. (TVA Ans. to Interrog. 7, Doc. No. 36-2, at 3; *see also* 29-2, at 1.) The old structure was "a standard wooden H-framed structure, 55 feet tall (48 feet above ground), made of two vertical poles, 8–15 inches in diameter, with a 26 foot crossarm." (Doc. No. 36-2, at 3.) The old structure supported one 69-kV electrical transmission line circuit and attachments. (*Id.*) One of the old structure's two vertical poles and one part of the cross arm were physically located within the SPC-92F right-of-way. (*Id.*) Besides the 69-kV transmission line, the vertical pole within the SPC-92F right-of-way supported a lightning protection shield wire (ground wire). (*Id.*)

The configuration of the replacement structure ("new structure") and its location within the SPC-92F right-of-way are depicted on the Stipulated Survey. (Doc. No. 29-2, at 2.) As described by TVA,

[t]he new structure is a steel, double-circuit, H-framed structure, made of two vertical poles, 120 feet tall (106 feet above ground) and 14.25–28 inches in diameter, with four, 28 foot crossarms. Only a portion of the new structure is situated on the Subject Property, and includes one vertical pole that supports one

69kV circuit (3-phase), one OPGW,[2] and portions of the four vertical crossarms. The remaining portion of the new structure is not located on the Subject Property; rather, it is located within Plaintiff's right-of-way on an adjacent property and consists of one vertical pole that supports one 161kV (3-phase) circuit, one OPGW, and the remaining portions of the four crossarms.

(TVA Ans. to Interrog. 8, Doc. No. 36-2, at 4; *see also* 29-2, at 2.)

The sole issue to be resolved by this court is the amount of compensation owed by TVA to the Nearys for the property rights acquired by TVA in the 2018 Taking, over and above those already acquired in 1941. (*See* Doc. No. 21, at 4.) In an effort to establish the value of the additional property rights taken within the pre-existing SPC-92F right-of-way, the Nearys retained Russell E. Parrish, a licensed Tennessee appraiser, to offer opinions relating to the Subject Property's value before and after the taking of the additional rights. (*See* Appraisal Report of: Property Belonging to Lorraine M. Neary & Lorraine E. Neary, Map 064I, Group A, Parcel 010.00313 Fairway Drive Clarksville, Tennessee 37034 (July 17, 2019) ("Report" or "Parrish Report"), Doc. No. 34-6.)

In his report, Parrish recognizes that the purpose of his appraisal is to (1) estimate the market value of the Subject Property as a whole as of the date of taking; (2) "estimate the value of that portion of the subject being acquired by [TVA] by Right of Eminent Domain"; and (3) "estimate damages, if any, to the remainder" of the Subject Property, and, based on these figures, "aid the [Nearys] in negotiating a fair price for the property acquired" by TVA. (Doc. No. 34-6, at 8.)

Regarding the first objective, Parrish concludes that the overall value of the Subject Property, "As-Is," before the 2018 Taking, was $266,500. (*Id.* at 10, 5.) To reach that valuation, he determines that the *unencumbered* value of the unimproved land on which the Nearys' house

_____

[2] The parties do not define this acronym, but, given the context, the court presumes that it stands for optical power ground wire, or some variant thereof.

is located—that is, its value assuming the presence of no house and no easement—would be $30,000 per acre, multiplied by 3.02 acres, or $90,600, based on a sales comparison with several specific similar—but unimproved and unencumbered—properties. He calculates this to be equivalent to $0.69 per square foot. (Doc. No. 34-6, at 98.) To account for the pre-existing SPC-92F right-of-way, he then assumes, without explanation, that the value of that portion of the land covered by the right-of-way (0.36 acre) would be reduced by 90% (or $9,738.27) and, again without explanation, that the overall value of the remainder of the land—that portion not covered by the easement—would be reduced by 25% ($19,987.51), yielding a rounded value of the land alone, as of the Date of Taking, of $61,000. (*Id.*) The important part of that calculation, for purposes of his additional calculations, is that the damages to the land covered by the SPC-92F right-of-way resulting from the 1941 Easement was $9,738.27.

He then purports to perform a sales comparison approach to determine the improved value of the Subject Property—again as unencumbered by the SPC-92F right-of-way. To do this, he compared the Subject Property to four specific comparable, but unencumbered, properties and analyzed their sale prices. Based on this comparison, he determined, hypothetically, that the improved but unencumbered value of the Subject Property would be $365,000. (Doc. No. 34-6, at 107.) To determine the value of the Subject Property as of the date of taking and "as is," that is, as actually encumbered by the SPC-92F right-of-way, Parrish deducts from the $365,000 the amount of the damages to that portion of the property subject to the SPC-92F right-of-way, or $9,738.27 (90 percent of the unencumbered value of the 0.36-acre portion of the land covered by the easement), to reach an adjusted value of $355,261.73. From there, he decides that the existence of the right-of-way diminished the value of the remainder by 25 percent, or $88,815.43 ($355,261.73 x 25%), but without any explanation for his selection of 25 percent as the

appropriate figure. Subtracting that $88,815.43 from $355,261.73, Parrish concludes that the total as-is value of the improved property on the date of taking was $266,446.30, which he rounded to $266,500. (*Id.* at 107.)

Although, as indicated above, Parrish apparently recognized that he was called upon, next, to estimate both the value of the rights being acquired by TVA and the damages to the remainder of the Subject Property, Parrish skipped directly to the question of the damages to the remainder. With regard to this question, his Report states as follows:

### MEASUREMENT OF DAMAGES

TVA has acknowledged buffer areas of 300' for occupied buildings and 1,200 for schools. The purpose of these buffers is to reduce the potential land use conflicts with trees, outbuildings, and ancillary facilities and potential visual impacts as well as exposures to Electric and Magnetic Fields (EMF).

With the existence of a pre-existing easement, I have determined that the damages to the remainder at are [sic] 25% due to 300' buffer of the entire tract, excluding .10 acre that is over 300', outside of the easement area.

0.10 x 43,560 [square feet] = 4,356.00 [square feet]

4,356 [square feet] x $0.69 = $3,005.64

$266,500.000 - $3,005.64 = $263,494.36

$263,494.36 x .25: $65,873.59

(Doc. No. 34-6, at 108.)

These conclusions inform his ultimate opinion, expressed as follows:

Value Overall Before take: $ 266,500.00
Value of Remainder Before Take: $ 266,500.00

Damages to the Remainder:
TVA has acknowledged buffer areas of 300' for occupied buildings and 1,200 for schools. The purpose of these buffers is to reduce the potential land use conflicts with trees, outbuildings, and ancillary facilities and potential visual impacts as well as exposures to Electric and Magnetic Fields (EMF).
With the existence of a pre-existing easement, I have determined that the damages to the remainder at are [sic] 25% due to 300' buffer of the entire tract, excluding .10 acre that is over 300', outside of the easement area.
0.10 x 43,560 = 4,356.00
4,356 x $0.69 = $3,005.64
$266,500.000 - $3,005.64 = $263,494.36

| | |
|---|---|
| $263,494.36 x .25: | $ 65,873.59 |
| Value of Remainder After Take: | |
| $263,494.36 - $65,873.59 + $3,005.64 = | $ 200,626.41 |
| Total Just Compensation Due Owner: | $ 65,873.59 |
| Rounded: | $ 65,875.00 |

(Doc. No. 34-6, at 3.)

TVA summarizes Parrish's opinions as follows: (1) that the Subject Property had a pre-take value of $365,000, based on the assumption that it was not subject to the preexisting easement; (2) that the value of the Subject Property before the 2018 Taking but after the 1941 Easement was $266,500, based on the assumptions that the value of the 0.36-acre portion within the easement was diminished by 90% and that the 1941 Easement diminished the remainder of the property by 25 percent; and (3) that the property had an after-take value of $200,626, based on the assumption that the taking of the additional rights within the preexisting easement diminished the property's value by an additional 25 percent. "In plain language, Mr. Parrish's disclosed opinions are that the pre-existing 1941 easement diminished the value of the [Subject Property] by slightly more than 25 percent and that the additional rights condemned in this action diminished the value of the [Subject Property] by slightly less than 25 percent." (Doc. No. 36, at 7.) TVA argues that all of these opinions should be excluded as unreliable. It contends that Parrish's opinion as to the pre-take value of the Subject Property does not conform to generally accepted appraisal standards or methodology and that it is not supported by adequate facts or data. It argues that Parrish's opinion as to the post-take value and the compensation due the Nearys must be excluded on the ground that it amounts to nothing more than *ipse dixit*, unsupported by any facts or data.

The Nearys oppose the Motion to Exclude, arguing that Parrish's opinion as to the pre-take value is properly based on a "sales comparison approach" and that his assessment of the

damage to the property is properly based on a "methodology based on the knowledge he has gleaned from his years of experience, training and education." (Doc. No. 38, at 9.) They argue that this evidence is admissible under Rule 702 of the Federal Rules of Evidence, as it is both relevant and reliable under the criteria established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and will "assist the trier of fact in understanding and disposing of issues relevant to the case." (Doc. No. 38, at 15 (quoting *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000)).)

With the court's permission, TVA filed a Reply (Doc. No. 41), largely reiterating the arguments in its Memorandum and pointing out weaknesses in the the defendants' Response.

## II. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 was amended in 2000 to reflect the Supreme Court's decisions in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). See Fed. R. Evid. 702 advisory comm. note, 2000 amend. ("In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science."). As

"gatekeepers," the district courts are charged with "discretion in determining whether . . . a proposed expert's testimony is admissible." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007).

The exercise of this discretion requires consideration of three factors: "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702). The Sixth Circuit has repeatedly recognized that "rejection of expert testimony is the exception, rather than the rule." *U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land in Tenn.*, 821 F.3d 742, 749 (6th Cir. 2016) (quoting *In re Scrap Metal*, 527 F.3d at 530). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Id.* (quoting *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998). The inquiry is "a flexible one"; "[t]he focus must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 594–95.

When assessing the admissibility of an expert's opinion, a key consideration is "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592–93. A testifying expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152 (1999). While there exists no "definitive checklist or test" for Rule 702, *id.* at 150 (citation omitted), *Daubert* establishes a number of factors that typically "bear on the inquiry," including: whether the theory or method in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether

the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Daubert*, 509 U.S. at 593–94. The *Daubert* factors apply to all types of expert evidence. *Kumho Tire*, 526 U.S. at 150. "In some cases (even cases involving nonscientific expert testimony), the factors may be pertinent, while in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (quoting *Kumho Tire*, 526 U.S. at 150).

The Sixth Circuit has identified some "[r]ed flags that caution against certifying an expert," including "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). Where the "factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the [challenged expert] testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). Generally, "a trial judge . . . ha[s] considerable leeway in deciding whether particular expert testimony is reliable." *Id.* at 152.

## III.    ANALYSIS

Under eminent domain, the government can take private property for public use upon the payment of just compensation to the owner. *U.S. ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 278–80 (1943). The burden of establishing the value of the property rights sought to be condemned is on the landowner. *Id.* at 273; *United States v. L.E. Cooke Co.*, 991 F.2d 336, 341 (6th Cir. 1993). And property owners typically rely on expert opinion to establish that value. "[U]nder *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered . . . will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues

relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 592 n.10).

In a condemnation case of this type, such valuation typically requires the resolution of three issues: "first, the before taking value of the land; second, the after taking value within the easement; and, third, the incidental damages to the land adjacent to the easement." *U. S. ex rel. Tenn. Valley Auth. v. Easement Over a Tract of Land in Madison Cty.*, 405 F.2d 305, 307 (6th Cir. 1968). Parrish expressly recognized that his mission was to address these three issues. (Parrish Report, Doc. No. 34-6, at 8.) TVA moves to exclude Parrish's opinions on the basis that they are not reliable.

### A.     Parrish's Analysis of Pre-Take Value Is Not Reliable.

The parties agree that the sales comparison approach to valuation is the generally accepted method for the valuation of property, and Parrish purported to employ this approach to his valuation of the pre-take value of the Subject Property. (Doc. No. 34-6, at 90.) TVA argues that, in performing appraisals using this approach, appraisers "must be able to support their measurement of damages opinions with facts specific to the taking in dispute and further instructs that damages opinions cannot be an arbitrary percentage based on an appraiser's 'vast years of experience.'" (Doc. No. 36, at 12 (quoting Real Property Valuation in Condemnation at 179, Doc. No. 34-3, at 4–5).)

Here, although the Subject Property was already encumbered by the existing 1941 Easement and the resulting SPC-92F right-of-way, none of the improved (or unimproved) properties to which Parrish compared it were likewise encumbered. The Parrish Report offers no explanation for the appraiser's decision to include in his comparison only unencumbered properties. Parrish does not suggest that market data pertaining to similarly encumbered properties was unavailable; he does not offer any indication that comparison of the Subject

Property with similarly encumbered properties would be inappropriate under the particular circumstances of this case, nor does he explain why it was appropriate to build a comparison upon the market price of unencumbered properties. The fact that the properties to which Parrish compared the Subject Property were not truly comparable in one critically important respect renders his initial opinion immediately suspect in terms of its reliability. *Accord United States v. 8.11 Acres in Grand Cty.*, No. 17-cv-01553-RM-SKC, 2019 WL 3425228, at *3, 4 (D. Colo. July 30, 2019) (recognizing that dissimilarities between sales of property proffered as comparable sales and the property involved in a condemnation action generally "goes to the weight, rather than to the admissibility of the evidence of comparable sales" but excluding expert testimony regarding three sales on the basis that "the transactions are too dissimilar to the subject property to be used as comparable sales").

Even more critically, the Report offers no explanation whatsoever for Parrish's determination that the value of the Subject Property should be reduced by 25 percent to account for the preexisting SPC-92F right-of-way. Parrish discloses no facts or data that he relied upon in forming his opinion that a 25 percent reduction was appropriate. In fact, the entirety of Parrish's analysis for making use of 25 percent as a variable in his mathematical calculation to reach the pre-take value of the Subject Property is contained on page 107 of his report:

> The subject is reconciled at $365,000.00
>
> Less pre-existing easement
> $365,000.00 - $9,738.27= $355,261.73
> Preexisting damages
> *$355,261.73 x 25% = $88,815.43*
> $355,261.73 - $88,815.43 = $266,446.30
> Rounded to: $266,500.00

(Parrish Report, Doc. No. 34-6, at 107 (emphasis added).)

As TVA points out, the Report contains no reference to a comparable sales analysis that considered the sale of improved lands encumbered by transmission lines, "no paired sales analysis, no market study, no appraisal study of encumbered properties that [Parrish] performed, and no citation to an appraisal study performed by any other person as supporting his negative 25 percent (-$88,815.43) adjustment." (Doc. No. 36, at 8.) According to TVA, Parrish's work file, which TVA subpoenaed, likewise contained no comparable sales analysis of encumbered properties, paired sales analysis, notes summarizing communications with any persons (buyers, developers, real estate agents) knowledgeable of the local real estate market, and no "citation or reference to the methodology used or relied upon in forming his damages opinion." (*Id.* at 9.)

The "red flags" identified by the Sixth Circuit caution against admission of this opinion testimony: the opinion appears to be based solely upon "improper extrapolation and subjectivity." *Newell Rubbermaid*, 676 F.3d at 527. Specifically, Parrish does not explain why he compared the Subject Property to unencumbered rather than encumbered properties, nor does he explain the source of the 25 percent figure by which he reduced the purported unencumbered value of the Subject Property. This percentage appears to have been drawn entirely from thin air, without reference to any objective marker or methodology. Parrish has failed to establish that the figure has any legitimate factual basis or that it is derived from identifiable data. To the extent he is claiming that this figure is based on his vast experience and conversations with others in the field, he does not explain this experience or identify any actual conversations, research, or data on which he relied. While it is apparent as a matter of simple logic that the value of similar unencumbered properties might be relevant for the purpose of, for example, a comparison with a number of encumbered properties to show that the average diminution in value caused by an encumberment similar to the 1941 Easement is 25 percent, Parrish did not make that type of

comparison. Instead, he selected 25 percent without any explanation whatsoever. His assumption that the 0.36-acre area within the right-of-way is worth 10 percent of the value of the property as unencumbered is similarly unexplained.

In short, the "analytical gap" between the data upon which Parrish purports to rely and the opinion he offers is not bridged by any rational explanation that would assist the trier of fact in reaching a conclusion as to the pre-take value of the Subject Property. *Gen. Elec. Co.*, 522 U.S. at 146. His selection of unencumbered properties appears to be unmoored to any particular rationale, and his selection of the 25 percent figure by which to reduce the value drawn from that comparison appears to be entirely speculative. The court finds that Parrish's opinion regarding the pre-take value of the Subject Property is unreliable and inadmissible.

### B. Parrish's Opinions Regarding the After-Take Value and Damages Are Unreliable.

A threshold requirement of any appraisal in this case is the identification of the property rights to be valued. Parrish, in fact, clearly understood that one of his tasks was the valuation of the property rights taken in the 2018 Taking, which required making a distinction between those rights already taken in connection with the 1941 Easement and those taken in October 2018. (*See* Doc. No. 34-6, at 8 (identifying one of the purposes of his appraisal as "estimat[ing] the value of that portion of the subject being acquired by the Tennessee Valley Authority by Right of Eminent Domain").) Parrish was also charged with ascertaining the damages caused to the Subject Property as a whole by the taking. (*See id.*) While that would appear to require two separate analyses, the Parrish Report does not reflect that Parrish actually reached an opinion regarding the value of the rights subject to the 2018 Taking. Instead, Parrish leaped directly to an opinion regarding the damages to the Subject Property as a whole, unrelated to any calculation of the value of the rights obtained during the 2018 Taking.

This gap and subsequent leap were explored during Parrish's deposition. Counsel for TVA asked Parris to confirm, during his deposition, that the "additional rights" that he was asked to value for purposes of his assignment were (1) the increased size of the structure, (2) the additional 161 kilovolt transmission line; and (3) the communication circuits installed within the right-of-way. (Parrish Dep. 27, Doc. No. 36-3, at 7.) Those were the only additional rights that he valued for purposes of his opinion. (*Id.* at 28, Doc. No. 36-3, at 8.) According to Parrish, those additional rights "had a ripple effect on the damages," arising from such things as "the increased frequency and maintenance and things like that." (*Id.*)

Regarding this "ripple effect," Parrish then confirmed that page 111 of his Report "summarizes [his] opinion of damages or diminution in value as of the taking." (Parrish Dep. 74, Doc. No. 36-3, at 9.) Asked to explain where in his Report he sets forth the appraisal methodology used to explain the formation of his opinion of the after-take value of the Subject Property, Parrish points again to the summary contained on page 111:

> Well, my methodology is explained in saying that there is a 300-foot buffer area and that I've determined that a 25 percent diminution or damages is with that area. That 25 percent is based on articles, publications, other items that I have read and based on experience and interviewing developers, buyers, and things of that nature.

(Parrish Dep. 74–75, Doc. No. 36-3, at 9–10.)

Counsel for TVA pressed further:

Q.      So I understand the 300-foot buffer area . . . . But now let's talk about that 25 percent.

A.      Yes.

Q.      As I understood it, you said that it's based on your personal experience, correct?

A.      Yes.

Q.      Your interviews with buyers, and developers, and other people?

A.      Yes.

Q.      And articles that you've read?

A.      Yes.

Q.      So let's start with the articles that you've read. Can you show me in your report where the articles that you've read, that you're relying upon to support your 25 percent diminution in value, are cited or referenced?

A.      They're not.

Q.      Can you show me in your report where your interviews with the developers, with the buyers are reflected?

A.      They are not.

Q.      Can you show me in your report, other than the statement of 25 percent, any prior studies or experiences that you're relying upon in forming your 25 percent diminution in value?

A.      They are not listed.

Q.      Are any of those materials included in the work file that was subpoenaed from your office?

A.      Yes. There are some electronic articles and studies that were sent I guess as a supplement to the work file.

Q.      . . . . I want to ask [you to] verify that there are no summaries in your work file of communications with buyers or developers that would support your 25 percent opinion of diminished value.

. . . .

A.      That is correct.

(Parrish Dep. 75–76, Doc. No. 36-3, at 10–11.) Parrish confirmed that, if he had spoken with any realtors, developers or anyone else in connection with his work on this case, he would have been required by USPAP standards to make and maintain a record of any such conversation and that his work file would have contained such notes. (*Id.* at 87, Doc. No. 36-3, at 12.)

Regarding the articles that were sent to supplement his work file, referenced in Parrish's testimony above, TVA represents that, just prior to his deposition, Parrish supplemented his

production with two articles he claims to have considered in forming his damages opinion that were inadvertently omitted from his report and work file: (1) David Wyman *et al.*, "The Pricing of Power Lines: A Geospatial Approach to Measuring Residential Property Values," Vol. 40, No. 1, *Journal of Real Estate Research* 121 (2018) (the "Wyman study") (Doc. No. 34-8); and (2) Kurt C. Kielisch, "Valuation Guidelines for Properties with Electric Transmission Lines, Appraisal Group One" (the "Kielisch article," Doc. No. 34-9). (*See* Doc. No. 36, at 9.)

Although Parrish testified very generally that he relied on these articles (*see* Parrish Dep. 81, Doc. No. 39-2, at 14), these articles do not, on their face, address situations similar to that at issue here. As explained by TVA's proffered expert, Mark G. Johnstone,

> [t]he Wyman study is a peer-reviewed study that uses four geospatial approaches to determine the pricing impacts of high-voltage transmission lines on **vacant lots** in Pickens County, South Carolina. The study concludes that there is a substantive pricing discount for residential **vacant lots** adjacent to [high voltage transmission lines ("HVTLs")], but acknowledges that the study "focus[es] **on vacant lots**; [so] the addition of residential housing structures may proportionally diminish the pricing impact of HVTLs on overall property value." Wyman at 149–50. The study does not analyze pricing impacts on improved residential lots such as the [Subject Property], and it does not analyze the acquisition of additional rights within an existing HVTL right-of way.

(Doc. No. 34-1, at 7.)

Similarly, Johnstone summarizes the import of the Kielisch article:

> The Kielisch article is a summary of literature and studies regarding potential effects of HVTLs on **rural land** (Kielisch at 14). The article contains no discussion or analysis of potential effects on value arising from the acquisition of additional rights within an existing HVTL right-of-way and no direct discussion or analysis of potential effects on value of the presence of a[n] HVTL on an improved residential lot within a suburban, residential subdivision.

(Doc. No. 34-1, at 8.)

Neither the Wyman study nor the Kielisch article is actually referenced, much less discussed, in the Parrish Report, and Parrish makes no attempt within the Report to link the 25

percent reduction in value to them or to "reconcile the data, facts, and methods discussed in these articles with the data, facts and methods material to his valuation" of the Subject Property. (*See* Doc. No. 34-1, at 7.) Specifically, he does not explain their relevance to his conclusions, in light of the significant differences between the properties that were the subject of these articles and the Subject Property.

In other words, although Parrish claims that the 25 percent figure is "based on articles, publications, [and] other items that [he has] read" and on interviews with developers, buyers, "and things of that nature," he then disclaims having conducted any interviews and fails to draw a connection between his conclusions and the articles with which he supplemented his Report (or any other articles). That leaves only his "experience" as the basis for his opinion. The court recognizes that an expert's experience is relevant and frequently may provide a legitimate basis for an expert's opinions. The Supreme Court has explained that an expert need not testify to what is "'known' to a certainty" but must only state "an inference or assertion . . . derived by the scientific method." *Daubert*, 509 U.S. at 590. By the same token, "the 'knowledge' requirement of Rule 702 requires more than subjective belief or unsupported speculation." *Tamaraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (quoting *Daubert*, 509 U.S. at 590). Here, Parrish has not explained how his experience informed his decision that the 2018 Taking resulted in a 25 percent diminution in value to the Subject Property, particularly because he has not explained to what extent the 2018 Taking extended the rights already taken in 1941. While "[e]xperts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge," the opinions must still have a reliable basis. *Daubert*, 509 U.S. at 592. Parrish has not adequately articulated the basis for his opinions in this case.

In fact, nothing in the Parrish Report establishes an analytical link between the data upon which Parrish purportedly relies and his opinion that the condemnation at issue in this case resulted in a 25 percent reduction in the pre-take value (which the court has already determined is an unreliable figure to begin with). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. at 146. The court finds, again, that there is "simply too great an analytical gap between the data and the opinion proffered." *Id.*

Parrish's opinion that the 2018 Taking caused a 25 percent reduction in the overall value of the Subject Property, causing damages in the amount of $65,875, is not based on any reasonably identifiable data or methodology. The defendants have not shown that the proffered opinions are "based on sufficient facts or data," that they are "the product of reliable principles and methods," or that Parrish "reliably applied [such] principles and methods to the facts of the case." Fed. R. Evid. 702. His opinions are unreliable and, therefore, inadmissible under Rule 702.

## IV.    CONCLUSION AND ORDER

With respect to Parrish's opinions related both to the pre-take and after-take value of the Subject Property as well as the amount of damages he finds would constitute just compensation for the 2018 Taking, the court cannot find that the glaring deficiencies go merely to the weight to be accorded the opinions rather than their admissibility. For the reasons set forth herein, the defendant's Motion to Exclude Opinion Testimony of Defendants' Retained Expert Russell E. Parrish (Doc. No. 35) is **GRANTED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge